## LEMON vs. WRIGHT.

1. A father sent a slave to his son, by "*a little boy*," the child of that son, in the year 1837, calling no witnessses to the gift, and using no words, at the time, creating a trust, or placing any limitations or conditions upon the gift. The son received the slave, treated her as his own, and paid taxes for her as such, and she was generally known as his property; was seized in execution and sold for his debts, but permitted by the purchaser to return to his possession, that he might have an opportunity of redeeming her. *Held*, that in a suit against this son, for the slave, by a vendee of the purchaser at Sheriff's sale, the testimony of defendant's father, (then eighty-five years of age,) taken after a lapse of more than twenty years, that the gift, in 1837, was to the wife and children of defendant, and not to himself, is insufficient to bar a recovery by plaintiff.

2. A parol gift, as above described, can not, by deed of the donor, made in September, 1839, by procurement by the son, be so qualified as to vest the property in the son as trustee for his wife and children, in prejudice of the rights of a creditor to whom the son became indebted in 1838, who commenced suit for the recovery of his debt, in July, 1839, and recovered judgment in January, 1840; nor in prejudice of the rights of a purchaser of said slave, at Sheriff's sale, under that judgment, as against such creditor or purchaser the deed is a nullity.

3. A., at the request of B. and his wife, purchased certain slaves in the year 1841, and placed them in the possession of B., promising to convey said slaves in such manner as to secure them to the wife and children of B., whenever he should be reimbursed the purchase money and interest. In 1853, not having been reimbursed to any extent, A. conveyed two of said slaves to B., in trust for his wife and children, and one to a daughter of B. At the same time A. took one of the slaves home with him, leaving one undisposed of, in B.'s possession, as before. In 1859 A. made a demand of B. for that one, and, on refusal, commenced this action of Trover for that slave. *Held*, first, that the taking home of two of the slaves by A., in 1853, was no reimbursement under the original agreement, unless he so expressly stipulated at the time of taking them, and did not bar his right of action. Secondly, that, even if reimbursed, A. was entitled, at Law, to recover the slave, to the end that he might convey and deliver her in accordance with his original promise.

Trover, in Spalding Superior Court. Tried before Judge CABANISS, at the May Term, 1860.

This was an action brought by Abel A. Lemon against Charles W. C. Wright, to recover damages for the alleged conversion of a negro girl slave named Ann, and her infant child, Jack.

PAROL TRUST IN LAND—RIGHTS OF PURCHASER. "Where one for value **purchases land** and thereby acquires all title thereto **owned by a mother,** who held the same under her father, and whose equitable title thereto was superior to any equity which her minor children had therein at the time of the purchase, **the vendee's title can not be defeated by a decree in favor of the children,** rendered upon a suit subsequently brought in their interest by the mother against the estate of her father for the recovery of the premises; the purchaser from the mother not being a party to this suit, and therefore not bound by the decree." Richards *v.* East Tenn. Railway Co., 106 Ga. 616 (8), 646. Simmons, C. J., dissenting. Id. 616.

The action was commenced on the 26th of April, 1859.

The defendant pleaded the general issue, and statute of limitations.

On the trial of the case the following state of facts was developed by the testimony, to wit:

In the year 1836 or 1837, Joseph Wright sent a negro girl, by the name of Mary, to the house of his son, Charles W. C. Wright, by his little son, intending, at the time, that said negro should go as a gift to the wife and children of said Charles W. C. Wright, but there was no proof of the declaration of that intention when the negro was sent. The negro remained in defendant's possession, and was controlled and used by him, until the 19th of September, 1839, when Joseph Wright executed the following deed, to wit:

"Georgia, Butts County.—Know all men by these presents, that I, Joseph Wright, of the county and State aforesaid, have this day, and do hereby, for and in consideration of the natural love and affection which I have toward my daughter-in-law, Elizabeth L. Wright, the wife of my son, Charles W. C. Wright, of the county of Jasper and State aforesaid, and her children, by the said Charles, a certain negro woman slave by the name of Mary, aged twenty-five years, and a negro girl slave (child of said Mary) about three years old, by the name of Sarah, to hold said negro slaves unto the said Elizabeth L. Wright and to the heirs of her body, by the said Charles, forever, together with all the increase of said negro woman and child. And I do hereby appoint my son, the said Charles W. C. Wright, the trustee to take charge of and protect the said woman and child, Mary and Sarah, and their issue, for the use of the said Elizabeth L. Wright, and the use of the heirs of her body, by the said Charles, to whom alone they belong, against all other persons whatsoever. In witness whereof I, the said Joseph Wright, have hereunto set my hand and affixed my seal, this 19th day of September, 1839.

"JOSEPH WRIGHT, [SEAL.]

"In presence of—

"B. H. SPENCER, and B. H. DARDEN, J. I. C."

This deed was recorded in the Clerk's office of Jasper Superior Court, the 2d day of October, 1839.

On the 7th day of April, 1840, the negro woman, Mary, and her child, Sarah, and also another child of hers by the

name of Harriet, were sold at sheriff's sale, by the sheriff of Jasper county, Georgia, under a *fi. fa.* from the Inferior Court of Jasper county, in favor of Anthony Dyer, assignee, against Charles W. C. Wright and Samuel A. Flournoy, makers, and Thomas H. B. Rivers, endorser, upon a judgment obtained in said Inferior Court, in an action commenced on the 2d day of July, 1839, on a note given the 8th of January, 1838. The *fi. fa.* was dated the 4th of January, 1840.

When the negroes were offered for sale by the sheriff, the defendant, Charles W. C. Wright, procured Joshua Hill, Esq., to announce to the bystanders that the title to the negroes, Mary, Sarah and Harriet, was not in said Charles, and said Hill, at the instance of said Charles, also read the deed from Joseph Wright, before stated. This announcement had the effect to prevent competition in bidding for the property.

Thomas H. B. Rivers bid off the negroes at five hundred dollars.

There was some conflict in the testimony, as to the value of the negroes, some testifying that Sarah and Harriet were sound, healthy negroes, worth, at the time of the trial, and some years before, $800 or $900 each, whilst others testified that they were unsound, diseased, and worth but little.

Before, and at the time of the sheriff's sale, the defendant, Wright, was going amongst his wife's relatives and friends, endeavoring to get some of them to bid off the negroes, and give him a chance to redeem them, and then have them settled on his wife and children.

Rivers let the defendant take the negroes home after the sale, in order to give him a chance to see if some of his friends could not be induced to pay the money and still give him an opportunity to redeem them.

The plaintiff being persuaded to do so by his mother, and by his sister, Mrs. Wright, and by the defendant himself (who promised that if the plaintiff would buy the negroes from Rivers, he would redeem them in a short time, at a fair price), bought the negroes from Rivers on the 4th of May, 1841, at the sum of eight hundred dollars, which he paid in money that was at a discount, and the whole eight hundred dollars less the discount, which was ten per cent., was credited upon the *fi. fa.* against Wright, Flournoy and Rivers.

The negroes still remained in possession of the defendant; until sometime in the year 1849, when the plaintiff transferred his title from Rivers to one Addison A. Wooten, the negro woman, Mary, then having five children, to wit: Sarah, Harriet, Ann (the negro in dispute) Caroline and Jane.

The negroes still remained in the possession of the defendant until the 24th of December, 1851, when Wooten reconveyed said negroes to the said plaintiff, together with a negro boy child named Henry, born after the transfer from plaintiff to Wooten. This conveyance was executed in the presence of the defendant, who was an attesting witness to the deed.

In the year 1852, the plaintiff took Sarah and Harriet home with him.

On the 9th of March, 1853, the plaintiff executed a deed of gift conveying Mary and her child, Henry, to his sister, Mrs. Elizabeth L. Wright, wife of the defendant, for her sole and separate use, and to the heirs of her body forever, appointing the defendant trustee to carry out the purposes of the deed.

On the same day the plaintiff also executed a deed of gift conveying to his niece, Martha Caroline Wright, the negro girl, Caroline, and her increase.

A short time before this suit was brought, plaintiff demanded the negroes in dispute, and defendant refused to give them up.

The negro girl, Ann, and her child, were shown to be worth $1,500, and for hire, $50 per annum.

There was some conflict in the testimony as to the value of Sarah and Harriet at the time plaintiff took them home, several witnesses testifying that they were sound, and worth $800 or $900 each, and others testified that they were unsound and comparatively worthless.

During the trial the plaintiff proposed to prove the value of the negroes given by him to Mrs. Wright and her daughter, Miss Martha Caroline Wright, which, being objected to by defendant's counsel, was repelled by the Court, and plaintiff excepted.

When Addison A. Wooten was offered as a witness for defendant, counsel for plaintiff objected to his testifying, on the ground that he was the husband of one of the daughters of Mrs. Wright, by the defendant, and was incompetent, although he had released his interest in the property; which

objection was overruled and the witness allowed to testify, to which the plaintiff excepted.

The jury returned a verdict for the defendant.

Whereupon, counsel for the plaintiff moved for a new trial, on the following grounds:

1. Because the Court erred in refusing to let counsel for the plaintiff prove the value of the slaves given by plaintiff to Mrs. Wright and her daughter.

2. Because the Court erred in permitting the witness, Addison A. Wooten, to testify in said case.

3. Because the Court erred in refusing to charge the jury, that if the negroes went into the possession of the defendant, under a parol gift to his wife and children, of which Rivers had no notice, and Rivers gave the defendant credit on the faith of said negroes, then the gift was void as against said Rivers.

4. Because the Court failed to charge the jury, that if the trust deed, made by Joseph Wright, was made to hinder, delay or defraud creditors, it was void as against such creditors, the Court not being requested so to charge, but the question being argued before the jury.

5. Because the jury found contrary to law and evidence.

6. Because the whole, and every part of the Judge's charge was contrary to law and unwarranted by the evidence, which charge is as follows, to wit:

"When Rivers purchased the negroes which were sold as defendant's property, at sheriff's sale, he purchased the title which the defendant had and no more. If the defendant had a good title, the purchaser got a good title. If the defendant had no title, the purchaser got none. If Joseph Wright sent the negroes, Mary and Sarah, to the wife of defendant, unexplained, and without imposing any conditions or restrictions upon the gift, the law presumes it to be an absolute gift to her, and the title to the negroes vested absolutely in her, and in her husband, by virtue of his marital rights, but he had the right to impose upon the gift of the negroes whatsoever conditions and restrictions he saw proper; and if he gave them to the wife and children of the defendant, such gift vested no title to the negroes in the defendant. If the terms of that gift were afterwards reduced to writing, and if, by the deed, the negroes were given to Elizabeth L. Wright and the heirs of her body, by Charles

W. C. Wright, the defendant, that was a gift to a specified and designated class of persons, and was not obnoxious to the objection of being an attempt to create an estate tail, in the heirs generally, of the body of Elizabeth L. Wright; and not being an estate tail, it was equivalent to a gift to Elizabeth L. Wright and her children, by Charles W. C. Wright, and, as such, no title vested in the defendant further than to hold the negroes in trust for his wife and children; and if the defendant had shown such to be the title which he held to the negroes, they were the property of his wife and children, and not his property; and when they were sold by the sheriff, as his property, the purchaser obtained no title which was sufficient to hold the negroes against the paramount outstanding title of the defendant, as trustee for his wife and children, if he had succeeded in showing such title for them. Defendant also relies upon an agreement by the plaintiff when he purchased the negroes from Rivers, the purchaser at sheriff's sale, to hold them for the benefit of his wife and children, upon being reimbursed the amount which he advanced to Rivers for them. If such was his agreement, he was bound by it, and if he had been reimbursed, was not entitled to recover the negroes sued for; and if he had not been reimbursed, he was entitled to recover them if the defendant had a good title to the negroes when they were sold by the sheriff as his property. If the defendant had no such title at that time, Rivers conveyed no title to the plaintiff which would entitle him to recover; and whether the negroes, Harriet and Sarah, were taken by the plaintiff in satisfaction and payment of the amount which he advanced to Rivers, was a question for the jury to determine according to the proof.

The presiding judge overruled the motion and refused the new trial, and this decision is the error alleged in this case.

DOYAL & CAMPBELL, for the plaintiff in error.

ALFORD, BECK & ATKINS, for the defendant in error.

*By the Court.*—JENKINS, J., delivering the opinion.

The evidence shows that the plaintiff in error (who was also the plaintiff below) derived title to the mother of the

slave, the subject of this suit, from the defendant. The mother, Mary, and two elder children, were seized in the year 1840, under execution, by the sheriff of Jasper county, as the property of the defendant, sold, and purchased by one Rivers, the assignee of the execution. Rivers agreed with the defendant, to allow him or any friend of his, to redeem the slaves, thus sold, and permitted them to remain in defendant's possession. At the pressing solicitation of defendant and his wife (plaintiff's sister), plaintiff purchased them of Rivers, still leaving open to defendant the privilege of redeeming them for the benefit of his wife and children, and suffering them to remain in defendant's possession. This purchase, by plaintiff, was in 1841, and the price paid eight hundred dollars. The girl, Anna, now sued for, has been born since. Mary and her children had been in defendant's possession, he expressing acts of ownership over them, since 1836 or 1837, and paying taxes for them, and generally considered the owner. During this interval the debt for the satisfaction of which they were sold, was contracted. This was plaintiff's title. The defendant pleaded the general issue, and the statute of limitations. The latter plea seems to have been abandoned, and indeed it would be strange if it were insisted upon, under the evidence.

Under the general issue, defendant has set up two separate and distinct lines of defence—the one referring to matters anterior to the sheriff's sale, at which Rivers, the vendor of plaintiff, purchased, denying that plaintiff ever had title; and the other, depending upon transactions subsequent to that sale—admitting that plaintiff acquired title, but subject to a conditional defeasance, which, he says, has become absolute.

It becomes necessary to consider each of these defences. The first rests upon the fact that the woman, Mary, never was the property of defendant, but came to his possession by virtue of a gift from the father of defendant, to defendant's wife and children. This is sought to be established by Joseph Wright, the father. He testifies that the woman, Mary, was his property, and that about the year 1836 or 1837, she went from his possession to that of defendant, in trust, as a gift to his wife and children, and not to him, defendant. He further says: "I parted with the title to said negro verbally, when first sent to defendant's house."

Subsequently he says: "Defendant's son, a little boy, came after her, and I sent her, as a gift, to defendant's wife and children." This, then, was the time and the occasion when he parted with the title; and the only representative of the other party to the gift, present at its consummation, was this little boy, a mere messenger, the servant of defendant, sent to fetch her. By this juvenile messenger she passed to the possession of defendant, who afterwards used and controlled her (as other witnesses testify) as his own, and as his, paid taxes for her. All outward, visible signs indicated to the world that she was his absolute property. There was no witness to the gift. The donor, himself, testifies to no words used by him, constituting a trust in defendant. It doth not appear whether the gift was of a life estate to defendant's wife, with remainder to her children, or to herself and her children then in life, as tenants in common. All is vague and uncertain, except the delivery, which was *to the defendant.* So the matter rested, to the entire satisfaction of all parties, until 1839, two or three years after, when Anthony Dyer had sued defendant for a debt of several thousand dollars, and shortly before the rendition of judgment, which, when rendered, would bind the whole of defendant's property. The defendant *then* drew a deed, purporting to be a conveyance of the slave, Mary, *and a child of Mary* (doubtless born after the verbal gift), to the defendant, in trust for his wife and children. This deed, which is mainly relied upon on this branch of the case, to defeat plaintiff's title, bears date, 19th September, 1839, and the judgment under which Mary and two children were afterwards sold, bears date in January, 1840. Counsel for defendant in error bestowed much argument upon this deed, and read many authorities to show that it was a valid conveyance to the wife and children, in trust, he taking no interest under it either by its terms, or by operation of law, in virtue of his marital rights. We deem it unnecessary to enter upon that investigation, believing the deed to be *dehors* the case. At the time of its execution, the pretended donor, as appears by his own testimony, was without title, and, therefore, could convey none. He swears that he "parted with the title to said negro when first sent," which was in 1836 or 1837. If he then parted with the title, somebody *then* acquired it. This branch of the defence must depend upon the verbal

gift. Scrutinizing the testimony touching that gift, we are constrained to hold, that it passed title to the defendant, to whom the delivery (which is the only part of the *res gestœ* that is clear and unequivocal), was made. To allow the donor, by his testimony, after an interval of twenty-two or three years, when he had attained the age of four-score and five years, to engraft upon a parol gift, trusts, not declared at the time, so far as the evidence discloses, and never heard of until the danger became imminent that creditors, who doubtless trusted the defendant upon the strength of his visible property, would be to establish a most dangerous precedent—to invite men in failing circumstances to fraudulent devices—in prejudice of the rights of *bona fide* creditors. The defendant, himself, who has been the active agent in shaping the curious history of this property, during more than a quarter of a century, and who perfectly understood the character of the parol gift, knew, and felt, that *it* would be an unsafe reliance to wrest the property from the grasp of creditors, and therefore resorted to the expedient of procuring a written deed from his aged father.

Our conclusion, from the evidence, is, that the title to Mary rested in the defendant when she went into his possession; that Rivers acquired a title to her and the two children sold with her, by purchase at sheriff's sale; and that the plaintiff acquired title in them by purchase from Rivers. This brings us to the consideration of the second branch of the defence. It is contended that, at the time of plaintiff's purchase, he agreed, whenever he should be reimbursed the price paid, with the interest thereon, to make some conveyance of the property for the benefit of the wife and children of defendant, and this is not denied. All this occurred in the year 1841. I leave out of view the conveyance to Wooten, and his reconveyance to plaintiff, both having been, by common consent, and nobody attaching any consequence to them, in the conduct of the case.

Defendant maintains that plaintiff has been reimbursed his outlay, and the interest upon it; yet he does not pretend that one dollar in money has been paid to plaintiff. These are the facts relied upon to show that plaintiff has been reimbursed. From the year 1841, when plaintiff purchased, until 1853—a period of twelve years—these slaves were permitted to remain in defendant's possession, plaintiff deriv-

ing no benefit from them, his outlay accumulating interest, and no part of it reimbursed. The question occurs here, how long, under this agreement, was he to remain unreimbursed, and dispossessed of the property? The ready answer would be, not beyond a reasonable time—for it would be a most convenient and desirable arrangement to the defendant to postpone him indefinitely. Then, was twelve years a reasonable time? This question will scarcely admit of a negative answer. At the expiration of the reasonable time, what was his legal right? To demand and recover the price paid, and interest upon it; or, in default of that, to terminate the defendant's possession, and reduce the property to his own possession?

In 1853, failing to procure payment, he conveyed, in trust, for the benefit of his sister, defendant's wife, two of the slaves; and to her daughter, Caroline, one of them. He took home with him two of them—no one disputing his right to do all this. But he leaves one of them, Anna, undisposed of by gift, and unreclaimed by himself—leaves her, as they had all been, for twelve years.

Thus things remain until 1859—six years longer—when plaintiff makes of defendant, a demand for Anna, the subject of this suit, which is met by a refusal to deliver her, and this suit is instituted.

Defendant insists, first, that at the time plaintiff conveyed some of those slaves to his wife and child, in 1853, he received the two whom he took home, as a satisfaction of his claim for reimbursement, but the record contains no evidence that he did so.

He then insists that they were, in value, a full reimbursement of his outlay and interest, and that he can claim no more. Evidence has been offered on both sides to show the value of these slaves, and the witnesses estimate their value very differently. But, in our opinion, this is no defence against the legal title of plaintiff—certainly none, in a Court of law. If resistance can be successfully made under these circumstances, to plaintiff's title, it may not be by this defendant, nor in the forum from which this case comes to us. If reimbursement of the price he paid for the negroes, with interest accrued, was by his agreement to separate a defeasance of his title, then, in a Court of law, a party setting up such a defeasance must prove payment, or tender of the

money, or the explicit acceptance, by the plaintiff, of some value in lieu of it. None of these have been proven.'

Again: this is not strictly a defeasance. Plaintiff's agreement was, not that upon the payment of the money the negroes should become the property of defendant, who now resists his title, but that, upon such payment, he would, by some proper conveyance, secure the property to defendant's wife and children. Even had he accepted the two as full reimbursement, he would be entitled to demand and recover the remainder from defendant, to the end that he might convey and deliver them in compliance with his agreement. We are clear that if, under the facts of this case, any rights can be asserted against plaintiff's title, they are mere equities, and can not be set up as a defence to this action at law.

On the trial, the jury found for the defendant, and the plaintiff moved for a new trial on several grounds, viz.: That the Court erred in overruling his objection to the competency of Wooten as a witness—in refusing to allow plaintiff to prove the value of the slaves given by plaintiff to defendant's wife, and to one of their children, in 1853—and in the charge to the jury—and that the verdict was contrary to law and evidence. The Court overruled the motion, and error is assigned upon the grounds of that motion.

We have not sufficient data to determine the competency of Wooten as a witness. He was doubtless incompetent, without a relinquishment of his interest. It seems he did relinquish, but his relinquishment is not in the record, and without a view of it, we will not attempt to adjudicate its sufficiency. The pertinency of the evidence, showing the value of the slaves conveyed by plaintiff, in 1853, is not apparent to us, and we can not, therefore, see that the Court erred in rejecting it. The errors imputed to the Court and jury, appertain to the merits of the case, and it will be sufficiently apparent, from the view we have taken of the case, that there was error in the charge and the verdict, and in what the error consisted, without more minute examination of the several grounds taken in the bill of exceptions.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court,

that the judgment of the Court below be reversed, and a new trial be granted, on the ground that the verdict of the jury was contrary to law, and strongly and decidedly against the weight of evidence.